IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 1, 2016 Session

**PATRICK R. MILLER v. VANDERBILT UNIVERSITY**

**Appeal from the Circuit Court for Davidson County**
**No. 11C3836     Thomas W. Brothers, Judge**

_____

**No. M2015-02223-COA-R3-CV – Filed September 29, 2017**

_____


In this health care liability action, after the plaintiff presented his case-in-chief, the trial court granted a directed verdict for the defendant hospital first on the claim for punitive damages and second on all remaining issues. The plaintiff appealed, arguing that the trial court erred: (1) in ruling that he had failed to produce material evidence that a specific agent of the defendant hospital had deviated from the standard of care and that deviation had caused an injury that would not otherwise have occurred; (2) in denying his motion to reopen the proof; and (3) in excluding evidence that he was uninsured. Discerning no reversible error, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY J. BENNETT, J., joined. RICHARD H. DINKINS, J., filed a separate, dissenting opinion.

Douglas S. Johnston, Jr., Nashville, Tennessee, for the appellant, Patrick R. Miller.

Thomas A. Wiseman III and Kimberly G. Silvus, Nashville, Tennessee, for the appellee, Vanderbilt University.


**OPINION**

**I.**

A. FACTUAL BACKGROUND

Patrick Miller suffered extensive injuries in a motorcycle accident on October 22, 2010, and was immediately transported by helicopter to Vanderbilt University Medical

Center.  Examination revealed a shattered left hip, a severely fractured tibia in his right leg, and multiple fractures in his left foot.  He also damaged his right popliteal artery, an artery that supplies blood to the knee and calf.  Mr. Miller was placed on a ventilator and admitted to the intensive care unit.

Mr. Miller's injuries were too severe to repair at one time.  On October 23, 2010, Dr. Jeffrey Dattilo, a vascular surgeon, repaired the damaged popliteal artery with a vein graft from Mr. Miller's left hip, and Dr. Hassan Mir, an orthopedic trauma surgeon, stabilized the fractured tibia with a metal plate.  Next, on October 25, 2010, Dr. Jason Evans, another orthopedic trauma surgeon, repaired his shattered left hip.  In a third surgery on November 2, 2010, Dr. Mir operated on his right knee and his left foot.

Mr. Miller was discharged from the hospital on November 5, 2010.  Upon discharge, he was provided with medications and rehabilitation equipment and scheduled to be seen in the Vanderbilt orthopedic clinic on November 18.

But two days after his discharge, Mr. Miller returned to the emergency department at Vanderbilt complaining of fever, nausea, blurred vision, and severe pain in his right leg.  His family reported foul smelling drainage from his right knee.  Dr. Evans opened the knee incision and removed a large amount of purulent material.  Mr. Miller had also developed a large amount of necrotic skin, tissue, and muscle in his right lower leg that had to be removed.

Because of the extensive muscle loss, Mr. Miller chose amputation over further attempts to save his right leg.  Dr. Mir performed an above-the-knee amputation on November 10.

On September 28, 2011, Mr. Miller filed this health care liability action against Vanderbilt University[1] in the Circuit Court for Davidson County, Tennessee seeking both compensatory and punitive damages.  According to the complaint, Vanderbilt failed to recognize and investigate the signs of infection that Mr. Miller exhibited before his discharge on November 5.  Mr. Miller alleged that he was negligently and recklessly discharged from the hospital, which allowed his infection to progress to the point that he was forced to have his leg amputated.

## B.  EXPERT TESTIMONY AT TRIAL

The jury trial began on November 3, 2015.  In his case in chief, the plaintiff presented testimony from a number of witnesses.[2]  He presented two expert witnesses:

---

[1] Vanderbilt University operates Vanderbilt University Medical Center.

[2] The plaintiff also showed the jury a portion of Dr. Manish Sethi's video deposition.  As an

Dr. David Gandy, a board certified orthopedic surgeon from Jackson, Mississippi who has been in practice since 1984, and Dr. Stephen Felts, an internal medicine physician who specializes in infectious diseases.

Dr. Gandy testified he was familiar with the standard of care for orthopedic surgeons treating trauma patients in Nashville, Tennessee. In his expert medical opinion, Mr. Miller's post-surgical care during his initial hospitalization deviated from the recognized standard of acceptable professional practice.

Dr. Gandy noted that Mr. Miller's white blood cell count showed a definite upward trend on November 1. He testified that an elevated white blood cell count "usually indicates infection." On November 2, Mr. Miller's white blood cell count was 22,300, well above normal, and according to Dr. Gandy, at this point the standard of care required "some more workup." Dr. Gandy stated:

> My – my primary criticism has been once that lab [on November 2] was done . . . somebody should have said, "Dr. Mir, we got a 22,000 white count. Should we get another white count?"

Dr. Gandy explained that an elevated white blood cell count alerts a doctor that "something is going on" but not "where the infection is." When asked what should have been done, he responded "the doctor should start looking for why." Dr. Gandy told the jury that he would have repeated the white blood cell count, ordered a urinalysis and chest x-ray, and checked the surgical wound sites.

According to Dr. Gandy, none of these things occurred. "[T]here was no further lab work done," and he saw no indication in the medical record that the doctors who performed the November 2 surgery examined the wound site before discharge. He also found it significant that on November 4, Mr. Miller's temperature rose to 102.2, and his heart rate was elevated. Dr. Gandy explained that the combination of fever and rapid heart rate was further indication of infection or body stress.

In Dr. Gandy's opinion, Vanderbilt deviated from the standard of care by failing to take any action in the face of a rising white blood cell count and in discharging Mr. Miller when he had clinical signs of an untreated infection. He further opined that, absent these deviations, Mr. Miller's leg could have been saved.

Plaintiff's other expert, Dr. Stephen Felts, stated that he was familiar with the

orthopedic trauma surgery fellow, Dr. Sethi assisted in Mr. Miller's surgical procedures. The plaintiff argues that Dr. Sethi's testimony is part of his prima facie case. But because Dr. Sethi provided no expert testimony on the applicable standard of care, deviations from the standard of care, or causation, we have not included his testimony in our summary.

recognized standard of acceptable professional practice for physicians treating patients with the symptoms Mr. Miller exhibited during his initial stay at Vanderbilt. Like Dr. Gandy, Dr. Felts opined that the failure to act on the elevated white blood cell count on November 2 was a deviation from the standard of care. Dr. Felts also agreed that Mr. Miller's discharge was a deviation from the standard of care. He testified that these deviations from the standard of care caused Mr. Miller to lose his leg. In his opinion, if an effective antibiotic regimen had been instituted in time, Mr. Miller's leg could have been saved.

At the conclusion of the plaintiff's proof, Vanderbilt moved for a directed verdict. The court first granted a directed verdict on the issue of punitive damages, finding that the plaintiff had not shown sufficient proof. Next, the court granted a directed verdict on all remaining claims. The court held that the plaintiff failed to establish, through expert medical testimony, the standard of care applicable to a specific agent of Vanderbilt, how that agent had deviated from the standard of care, and that the deviation had caused an injury that otherwise would not have occurred, as required by Tennessee Code Annotated § 29-26-115.

## II.

The plaintiff argues that the trial court erred in granting both directed verdicts. He also asserts that the trial court abused its discretion in refusing to allow him to reopen the proof to correct any deficiencies in his expert proof and in excluding testimony and argument related to his health insurance status.[3]

### A. EXCLUSION OF EVIDENCE

We begin with the plaintiff's evidentiary issue. During opening argument, plaintiff's counsel indicated that Mr. Miller was discharged because he lacked health insurance. Vanderbilt objected, arguing, among other things, that the plaintiff's health insurance status was irrelevant and prejudicial. The trial court agreed and excluded any testimony and argument based on Mr. Miller's health insurance status.

We review the trial court's evidentiary decisions for an abuse of discretion. *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015), *as revised on denial of reh'g*, (Aug. 26, 2015). "A trial court abuses its discretion by applying an incorrect legal standard or reaching an illogical or unreasonable decision that causes an injustice to the complaining party." *Id.*

---

[3] Vanderbilt raises a separate issue of whether the trial court erred in finding that Dr. Gandy and Dr. Felts were qualified to testify as expert witnesses. Because we conclude that the plaintiff failed to establish a prima facie case under Tennessee Code Annotated § 29-26-115, we do not reach this issue.

The plaintiff asserts that evidence of his health insurance status was relevant to Vanderbilt's motive in discharging him and his punitive damages claim. But motive is not an element of a health care liability action. *See* Tenn. Code Ann. § 29-26-115(a) (2012). The issue was whether an agent or employee of Vanderbilt deviated from the standard of care in treating Mr. Miller and whether that deviation caused an injury that would not otherwise have occurred. *Id.* Why the defendant may have deviated from the standard of care is not a fact of consequence in a health care liability action. *See* Tenn. R. Evid. 401 (defining relevant evidence).

Even if the plaintiff's health insurance status were relevant to his punitive damages claim, the probative value of the evidence was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The plaintiff conceded that no Vanderbilt representative would testify that Mr. Miller was discharged because he lacked health insurance and no member of Mr. Miller's family would testify that they were told that Mr. Miller was being discharged because he lacked health insurance. Under these circumstances, we conclude that the trial court did not abuse its discretion in excluding evidence that Mr. Miller was uninsured.

## B. PARTIAL DIRECTED VERDICT ON PUNITIVE DAMAGES

Next, we address the plaintiff's appeal of the trial court's grant of a partial directed verdict on his punitive damages claim. "A motion for directed verdict requires the trial court to determine whether, as a matter of law, the evidence is sufficient to create an issue for the jury to decide." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999). Directed verdicts are appropriate only when reasonable minds could reach only one conclusion from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). "A case should go to the jury, even if the facts are undisputed, when reasonable persons could draw conflicting conclusions from the facts." *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000). But the conclusions cannot be based on "speculation, conjecture, and guesswork." *Id.*

When reviewing a trial court's decision regarding a directed verdict, appellate courts apply the same standard of review as the trial court. *See Sauls v. Evans*, 635 S.W.2d 377, 379 (Tenn. 1982). We do not weigh the evidence or evaluate the credibility of witnesses. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995). Instead, we "take the strongest legitimate view of the evidence in favor of the non-moving party." *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). We allow all reasonable inferences in favor of the non-moving party and disregard all evidence contrary to their position. *Id.*

Punitive damages are reserved for the most egregious cases. *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 777 (Tenn. Ct. App.

5

2012). The plaintiff must prove, by clear and convincing evidence, that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). On this record, we find no evidence, much less clear and convincing evidence, that the defendant acted in such a manner. Thus, we conclude that the partial directed verdict on plaintiff's claim for punitive damages was appropriate.

## C. DIRECTED VERDICT ON ALL REMAINING CLAIMS

Next, we consider whether the trial court abused its discretion in granting a directed verdict on all remaining claims. The plaintiff's claim against Vanderbilt was based solely on vicarious liability. The trial court held that "the plaintiff must identify the individual agent of the principal that deviated from the standard of care and that caused an injury that otherwise would not have occurred." The court reviewed the expert testimony and "found no record of the Plaintiff's experts specifically identifying an individual physician and saying that physician failed to comply with the standard of care by certain actions, and that that physician's actions resulted in harm to Mr. Miller which would not otherwise have occurred."

"To avoid a directed verdict . . . , the non-moving party must present some evidence on every element of its case—enough evidence to establish at least a prima facie case." *Richardson*, 44 S.W.3d at 30. To establish a prima facie case in a health care liability action, the plaintiff must provide material evidence, through expert medical testimony, on three essential elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a); *Shipley v. Williams*, 350 S.W.3d 527, 537 (Tenn. 2011).

In Tennessee, "a principal may be held vicariously liable for the negligent acts of its agent when the acts are within the actual or apparent scope of the agent's authority."[4]

---

[4] On appeal, Vanderbilt also argues that the plaintiff failed to produce evidence at trial that the individual physicians were agents of the hospital. But Vanderbilt admitted in its answer that the

*Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 105 (Tenn. 2010). Although the plaintiff is free to sue the principal without suing the agent, the principal's liability remains purely derivative. *Id.*; *Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d 240, 251 (Tenn. 2010); *see also Ali v. Fisher*, No. E2003-00255-COA-R3-CV, 2003 WL 22046673, at *5 (Tenn. Ct. App. Aug. 29, 2003), *aff'd*, 145 S.W.3d 557 (Tenn. 2004) ("Vicarious liability is imputed legal responsibility for the acts of another.").

The same rule applies in a health care liability action premised on the vicarious liability of a hospital. The hospital's liability is "based upon the principle 'that the wrong of the agent is the wrong of his employer.'" *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 415 (Tenn. Ct. App. 1988) (quoting *Raines v. Mercer*, 55 S.W.2d 263, 264 (Tenn. 1932)). To make a prima facie showing of the "wrong of the agent," the plaintiff must present expert testimony on the standard of care applicable to the agent, that the agent deviated from that standard, and that the plaintiff's injuries were a proximate result of that deviation. Tenn. Code Ann. § 29-26-115(a). Without that showing, negligence may not be imputed to the principal.

The plaintiff argues that Dr. Gandy's testimony in conjunction with Mr. Miller's medical records established a prima facie case.[5] We disagree. First, the plaintiff cannot substitute the medical record for expert testimony. The statutory requirements are clear. The plaintiff has the burden of providing material evidence on all three essential elements through expert testimony.[6] *Id.* § 29-26-115; *Shipley*, 350 S.W.3d at 536-377. Second, we conclude that Dr. Gandy failed to adequately identify a specific agent of Vanderbilt that deviated from the standard of care and whose deviation caused an injury that would not otherwise have occurred.

Dr. Gandy testified that the recognized standard of care for orthopedic surgeons treating trauma patients in 2010 required an orthopedic surgeon to recognize the November 2 white blood cell count as potential evidence of an infection and to attempt to

---

"individuals who provided care and treatment to the plaintiff while the plaintiff was a patient at Vanderbilt University Medical Center were the defendant's employees and acting within the course and scope of their employment." No proof is necessary to prove allegations that were admitted in the answer. *Rast v. Terry*, 532 S.W.2d 552, 554 (Tenn. 1976); *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1988).

[5] Alternatively, the plaintiff contends that because the orthopedic trauma service at Vanderbilt used a "team approach" to patient care, he should not be required to determine which individual physician was responsible for his care. We are not persuaded that it is unfair to require the plaintiff to meet the statutory burden of proof under these circumstances. Vanderbilt's negligence cannot be presumed. Tenn. Code Ann. § 29-26-115(c).

[6] The common knowledge exception to the expert testimony requirement is not applicable here. *See Murphy v. Schwartz*, 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986).

discern the source of any infection by examining the patient and ordering additional tests. But rather than identify the specific orthopedic surgeon or surgeons who were subject to that standard and how he or they deviated from that standard, Dr. Gandy opined more generally that "they failed to investigate," "they didn't follow up on it," and "nobody did anything else after that."[7] Similarly, Dr. Gandy testified about Mr. Miller's discharge without specifying which individual physician made the decision to discharge.

Dr. Gandy's only reference to any individual orthopedic surgeon is the following testimony:

> Q. And the -- do -- do you recall who the surgeons were for [the November 2 surgery]?
> A. Dr. Mir was the primary surgeon. I don't recall the -- the assistant surgeon.
> Q. Dr. Sethi?
> A. Dr. Sethi was listed as one of them.
> Q. Right.
> A. But I don't remember -- I believe there were two, I believe, but I'm not sure.
> Q. All right. Dr. Gandy, did Dr. Mir examine the surgical wound site from 11/2 before Mr. Miller's discharge on November the 5th?
> A. There's nothing in the record to that effect.
> Q. Is there anything in the record that would indicate that Dr. Sethi examined the wound site from 11/2 before Mr. Miller's discharge on 11/5?
> A. No.

And later, Dr. Gandy stated:

> My -- my primary criticism has been once that lab was done -- if they're having meetings every -- 6:00 in the morning, somebody should have said, "Dr. Mir, we got a 22,000 white count. Should we get another white count?"

Dr. Gandy failed to draw a connection between the deviations from the standard of care that he identified and any individual physician. His identification of Dr. Mir and Dr. Sethi as two orthopedic surgeons who operated on Mr. Miller but who did not examine his wound site after November 2 is insufficient. He never testified that one or both of these physicians were responsible for Mr. Miller's post-surgical care and

---

[7] In discussing causation, Dr. Gandy continued to express himself in generalities: "So if they had been alert and aware that there was something going on in there[,] . . . [i]f they had ruled out other areas of infection, gone in and looked at the leg[,] . . . if they'd have gotten it fast enough, they could have preserved some of the -- the muscle in there to preserve a below-the-knee amputation."

discharge. Dr. Gandy's testimony that "somebody" should have asked Dr. Mir to take action also falls short because it asks the jury to simply assume that Dr. Mir was responsible. A jury verdict in Mr. Miller's favor based on this evidence could only rest on impermissible "speculation, conjecture, and guesswork." *Richardson*, 44 S.W.3d at 30. We conclude that the trial court did not err in directing a verdict on all remaining claims.

## D. DENIAL OF PLAINTIFF'S MOTION TO REOPEN PROOF

Finally, we address the trial court's denial of the plaintiff's motion to reopen the proof to allow Dr. Gandy to provide additional expert testimony. After the trial court announced it was granting a directed verdict in Vanderbilt's favor on all issues, the plaintiff moved to reopen the proof. Vanderbilt objected, and the trial court, noting its obligation to be fair to both sides, denied the plaintiff's motion. The decision as to whether to reopen the proof to admit additional evidence is within the sound discretion of the trial court. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991).

The plaintiff's only explanation for why this testimony was not provided during his case in chief is that he was unaware that he had to meet this "heightened evidentiary burden." Heightened or not, the burden of proof in a health care liability action is statutorily mandated and should be readily apparent. Tenn. Code Ann. § 29-26-115(a). The obligation to prove an agent's negligence in a case premised solely on vicarious liability is also based on longstanding agency rules. *See Parker*, 767 S.W.2d at 415-16.

Still, the plaintiff argues that the trial court should have given him a second chance to establish a prima facie case based on this court's decision in *Iloube v. Cain*, 397 S.W.3d 597, 605 (Tenn. Ct. App. 2012). In *Iloube*, the plaintiff provided testimony on his medical expenses but did not introduce the actual medical bills as exhibits. At the conclusion of the plaintiff's proof, the defendant moved for a directed verdict on the claim for medical expenses, citing the best evidence rule. Tenn. R. Evid. 1002. After the motion, but before the court's ruling, the plaintiff moved to reopen the proof to enter his medical bills and other documentary proof of medical expenses into evidence. The court denied the motion without explanation. *Iloube*, 397 S.W.3d at 604-05. Based on "the entirety of the circumstance," this court held that the trial court's denial of the plaintiff's motion to reopen the proof for the narrow purpose of introducing documentary evidence of his medical expenses was an abuse of discretion. *Id.* at 605.

As *Iloube* makes clear, the decision whether to reopen the proof depends on the unique facts of each case, and here we conclude that the plaintiff had a "reasonable opportunity to prove his case." *Id.* (quoting *Bellisomi v. Kenny*, 206 S.W.2d 787, 788 (Tenn. 1947)). The plaintiff was seeking to present evidence that was available during his case in chief. He did not make his motion until after the court announced its decision

9

on the motion for directed verdict. Producing an expert witness to testify is not the same as introducing a missing exhibit. Dr. Gandy, an out-of-state witness with an active medical practice, had concluded his testimony two days earlier. Under these facts, we conclude that the trial court's decision was not an abuse of discretion.

## III.

For the foregoing reasons, the trial court's decision is affirmed and the case remanded for further proceedings consistent with this opinion.

_____
W. NEAL McBRAYER, JUDGE